U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

**Project No.:** 125-35073-PM **HAP CONTRACT NO.:** SF 1525

**Mortgagee** WEYERHAEUSER MORTGAGE COMPANY

**Amount of Mortgage Note** $3,685,100.00 **Date** September 1, 1!

**Mortgage: Recorded:** Concurrently herewith **State** Nevada **County** Clark **Date**

**Book** **Page**

Originally endorsed for insurance under Section 221(d)(4) of the National Housing Act.

This Agreement entered into this 1st day of September , 1979 , between Regatta Apartments, a Nevada limited partnership whose address is P. O. Box 980, Las Vegas, Nevada 89101

their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*.

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 1,136.00 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services included in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwithstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

* (1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national orgin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284,82 Stat. 73)* Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts 1, 100, and 110, and Subparts I and M of Part 200)*.

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be desienated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c). Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregati... ...:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held:

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (c) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representati... executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: All present and future partners

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

Regatta Apartments, a Nevada limited partnersh
*(Owners)*

Seal

WITNESS

By [signature] Frank H. Blackburn, General Partner

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING COMMISSIONER

Original signed by:
Paul R. Kaup

By ______________________
*(Authorized Agent)*

*(Add proper acknowledgements)*



HUD-92455 (6-77)

US GOVERNMENT PRINTING OFFICE: 1978-...

STATE OF NEVADA )
) SS
COUNTY OF CLARK )

On September 21, 1979

before me, the undersigned, a Notary Public in and for said State, personally appeared Frank M. Blackburn known to me to be one of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

Signature *Joanna M. Rink*

OFFICIAL SEAL
JOANNA M. RINK
NOTARY PUBLIC - STATE OF NEVADA
COUNTY OF CLARK
My Appt. Expires Mar. 16, 1983

STATE OF CALIFORNIA )
) SS
COUNTY OF *SAN FRANCISCO* )

On September *25*, 1979 before me, the undersigned, a Notary Public in and for said State, personally appeared *PAUL R. KAUP* known to me to be the authorized agent of the Secretary of Housing and Urban Developm[ent] acting by and through the Federal Housing Commissioner ________, known to me to be the person ________ whose name is subscribed to the within instrument and acknowledged that he executed the same.

WITNESS my hand and official seal.

Signature *Walter Duncan Jr.*

Walter Duncan, Jr.

Name (Typed or Printed)

OFFICIAL SEAL
WALTER DUNCAN JR.
NOTARY PUBLIC • CALIFORNIA
SAN FRANCISCO COUNTY
My comm. expires NOV 8, 1981
519 Laguna Street, San Francisco, CA 94102

SCHEDULE "A"

Attached hereto and made a part of that certain Regulatory Agreement by and between REGATTA APARTMENTS, a limited partnership and the SECRETARY OF HOUSING AND URBAN DEVELOPMENT

Situate in the County of Clark, State of Nevada, described as follows: A portion of the East Half (E½) of Government Lot 2, Section 19, T.20 S., R. 62 E., M.D.M., Clark County, Nevada, more particularly described as follows:

COMMENCING at the Southeast corner of said Government Lot 2; thence N. 01°03'25" W., along the Easterly line thereof, 425.05 feet to the TRUE POINT OF BEGINNING; thence continuing N. 01°03'25"W., 329.32 feet to a point on the Southerly boundary of Regatta Estates as shown by a plat on file as Book 22 of Plats, Page 98, on file in the Clark County, Nevada Official Records; thence along the said Southerly boundary the following courses: S. 88°56'35" W., 140.00 feet; N. 01°03'25" W., 457.72 feet; N. 89°38'21" W., 529.77 feet to a point on the West line of the aforesaid East Half (E½) of the Government Lot 2; thence along said line, S. 00°52'52" E., 503.92 feet; thence departing said line, S. 89°33'46" E., 314.35 feet; thence S. 00°44'27" E., 278.69 feet; thence S. 89°33'46" E., 358.57 feet to the TRUE POINT OF BEGINNING.

CERTIFIED TRUE AND CORRECT COPY OF Regulatory Agreement

RECORDED ON Sept. 27, 1991 IN THE OFFICE OF THE COUNTY

RECORDER OF Clark COUNTY AS DOCUMENT NO. 1083581, Bk 1124

E.J. Chiarelli