JOHN PETER LEE, LTD.
JOHN PETER LEE, ESQ.
Nevada Bar No. 001768
PAUL C. RAY, ESQ.
Nevada Bar No. 004365
830 Las Vegas Boulevard South
Las Vegas, Nevada 89101
(702) 382-4044
Attorneys for Plaintiff

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

REGATTA BAY LIMITED,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

No. 04-1403C
(Judge Hodges)

604.022029 dp

**AFFIDAVIT OF PHIL R. ROSEQUIST**

Attached hereto is a copy of the Affidavit of Phil R. Rosequist filed in the United States District Court, District of Nevada, Case No. CV-S-03-1009-RCJ-(PAL), on March 5, 2004.

DATED this 28th day of April, 2005.

JOHN PETER LEE, LTD.

JOHN PETER LEE, ESQ.
Nevada Bar No. 001768
PAUL C. RAY, ESQ.
Nevada Bar No. 004365
830 Las Vegas Boulevard South
Las Vegas, NV 89101
(702) 382-4044 Fax: (702) 383-9950
*Attorneys for Plaintiff*

JOHN PETER LEE, LTD.
JOHN PETER LEE, ESQ.
Nevada Bar No. 001768
PAUL C. RAY, ESQ.'
Nevada Bar No. 004365
830 Las Vegas Boulevard South
Las Vegas, Nevada 89101
(702) 382-4044
Attorneys for Plaintiff

✓ FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD
MAR - 5 2004
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

REGATTA BAY LIMITED,
Plaintiff,
vs.
UNITED STATES OF AMERICA,
Defendant.

CASE NO. CV-S-03-1009-RCJ-(PAL)

604.022029 dp

## AFFIDAVIT OF PHIL R. ROSEQUIST

STATE OF NEVADA )
) ss:
COUNTY OF CLARK )

Upon being duly sworn, Affiant deposes and says:

1. That he makes the statements contained herein of his own personal knowledge except as to those matters stated upon information and belief and as to such matters, he is informed and reasonably believes them to be true and is competent to testify to the same.

2. He is the General Partner of Regatta Bay Limited ("Regatta Bay" or "Regatta"), a Nevada Limited Partnership which owned the Regatta Bay Apartments, a 120-unit complex located at 2101 Sandy Lane, Las Vegas, Nevada 89115 from on or about November 2, 1983 through on or about December 4, 2001.

3. Regatta Bay acquired the subject apartments subject to a Deed of Trust securing a Deed of Trust Note for the original principal sum of $3,685,100.00, and Regatta Bay assumed a

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

Regulatory Agreement for Insured Multi-Family Housing Projects ("Regulatory Agreement", a true and correct copy of which is attached hereto as Exhibit "1") signed by Paul R. Kaup, an authorized agent for the United States Department of Housing and Urban Development ("HUD"), on or about September 25, 1979. The Deed of Trust Note required monthly payments on the first day of each month and established late fees for payments made later. At the outset of its involvement, Regatta Bay provided a copy of its limited partnership agreement, a true and correct copy of which is attached hereto as Exhibit "2", to HUD as required, which informed HUD at Section 10 of the General Partner's authority to make working capital loans to Regatta Bay.

4. During Regatta Bay's ownership of the apartments since November 1983 in the prior sixteen years of Regatta's course of performance under the Deed of Trust Note and the Regulatory Agreement, whenever Regatta was late with any payment Regatta paid a contractually pre-determined late fee which Reilly and HUD accepted as not being a material breach a Regatta provided monthly reports to HUD as required, and HUD never objected to the lateness of any of Regatta's payments which were actually made after the deadline of the first of the month on numerous occasions throughout the time of Regatta Bay's ownership. Discovery of Reilly's and HUD's records should further confirm this fact of HUD's knowledge, acquiescence and acceptance of Regatta's course of performance, which HUD has not actually disputed in the Federal Defendant's Motion. Such discovery should also confirm that HUD did not name the course of performance a "material breach" until after more than sixteen years went by.

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

5. Attached hereto as Exhibit "3" is a true and correct copy of a June 29, 1994 letter from the local HUD office at 1500 East Tropicanna, Las Vegas, Nevada representing that office to have authority to act for HUD by stating:

> On April 15, Secretary, Henry G. Cisneros implemented the field reorganization for the U.S. Department of Housing and Urban Development (HUD). From this day forward, HUD will be doing business in a new way!
>
> Specifically, this office has full authority to make decisions and work with you as a partner to build better, stronger communities. This office has now been designated the primary point of contact for coordination of all HUD programs for your community.

6. On or about March 24, 2000, Janet Browder, Director, Multifamily Hub in San

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

Francisco, and Scott Hunley, Director, DEC, Los Angeles, Satellite Office for HUD, sent a letter to Regatta Bay requiring Regatta Bay to address issues HUD raised therein about the apartments within thirty (30) days, a true and correct copy of which letter is attached hereto as Exhibit "4". HUD therein demanded payment forthwith from Regatta of $1,327,420 plus a reversal of accrued interest of $152,665, totaling some $1.48 million.

7. With respect to HUD's wrongful demand in the March 24, 2000 letter, a true and correct copy of which is attached hereto at Exhibit "4", Affiant reviewed the matter with David Ewing, the then HUD authorized agent in the local Las Vegas office who was Regatta's contact person. Mr. Ewing recommended that Affiant not put in any more of his money into the Regatta Bay project because HUD intended to enforce the $1.48 million dollar demand to the extent of foreclosing on the Regatta Bay property regardless of the lack of merit to the demand.

8. Regatta paid its June, 2000 payment to the loan servicing agent, Reilly Mortgage Group, Inc. ("Reilly").

9. According to HUD's documents at Exhibits 7, 8, 10 and 13 of Federal Defendant's Motion, Regatta Bay made its June payment, but HUD wrongfully declared on July 19 that a missed payment of Regatta Bay by July 1, 2000 was a "continuing material breach".

10. Reilly's July 26, 2000 letter to Regatta attached as Exhibit 9 to the Federal Defendant's Motion filed December 22, 2003 states:

> We have been advised by the US Department of Housing and Urban Development that Regatta Apartments has violated its contractual obligations under the Deed of Trust Note and Deed of Trust. Specifically, the mortgagor has failed to correct the continuing material breach.

The only alleged continuing material breach of which HUD had ever give Regatta notice was the wrongful demand contained the March 24, 2000 letter, a true and correct copy of which is attached hereto as Exhibit "4".

11. Further discovery should also show that HUD conducted an Inspector General's audit, No. 94-SF-212-1002 issued on or about December 20, 1993, which HUD closed with full knowledge of the advances at issue because of HUD's knowledge that the advances by the General Partner were consistent with HUD's policies and did not constitute material breaches of any of Regatta Bay's

agreements with HUD or with the lender Reilly. Further discovery should also show numerous additional items of correspondence in HUD's possession, including any remaining archived records of sixteen years of Regatta's annual certified audits, monthly HUD operating reports and other correspondence. (Exhibit "2", Section 10 on Working Capital Loans from the General Partner .)

12. Regatta Bay's accounting was literally an open book to HUD. Regatta Bay provided annual certified audits and monthly cash flow reports. Affiant never made personal withdrawals or received repayment of advances for personal use other than to repay loans he had made to Regatta Bay on at least as favorable terms as were otherwise commercially available, at prime rate. Affiant's advances were always at his personal risk from funds he had borrowed on other lines of credit at less favorable terms than the terms to which he loaned to Regatta. Further discovery should further confirm from accounting experts that Regatta's repayment and Regatta's disbursement of Regatta's repayment as shown by HUD's own records were pursuant to such working capital loans as contemplated by the Limited Partnership Agreement and which were necessary for the payment of reasonable and necessary operating expenses of the Regatta Bay Apartments, as well as HUD's knowledge, acceptance and/or acquiescence of these facts. Regatta's C.P.A., Bill McCarthy can perform the needed analysis to verify and/or evaluate Regatta's accounting and these advances, but Mr. McCarthy's schedule is very busy during this tax season and he requests enough time after tax season to conduct his analysis for this case. Alternatively, Regatta Bay may seek a different C.P.A. with earlier availability.

13. In HUD's March 24, 2000 letter stating its wrongful demand for $1.48 million dollars payment by Regatta Bay forthwith, HUD never identified the allegedly breaching repayments of advances with any specificity.

14. On or about August 29, 2000, Frank M. Malone, Director of Multi-Family Asset Management for HUD, sent a letter notifying Regatta Bay that HUD concluded Regatta Bay to be in violation of the Regulatory Agreement, a true and correct copy of which letter is attached hereto as Exhibit "5". This letter recognizes that Regatta had met all of HUD's inspection and maintenance plan requirements.

15. The only two bases for declaring default stated by Mr. Malone were the incorrect

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

conclusions that: 1) payments of $1,327,424.00 and charges for interest of $152,665.00 were improper and 2) Regatta's failure to pay such amounts at that time allegedly constituted violations of the Regulatory Agreement. In fact, to date, HUD has never identified such alleged "continuing material breaches" by Regatta with specificity. The most specific HUD ever identified the alleged continuing breaches was an after-the-fact, unsigned, unsubstantiated letter faxed to Regatta's counsel dated May 3, 2001, presumably from Luc-Andre Odabashian, a true and correct copy of which is attached hereto as Exhibit "6". Page 2 of Exhibit "6" shows that HUD provided alleged annual totals of repayments of advances, but no specific transactions were identified. The charts on page 2 further show that HUD had full knowledge that the most recent of the alleged "continuing material breaches" were more than seven years old and that those most recent alleged breaches followed a history of HUD's acceptance for twelve years previously the exact same practice which Regatta fully disclosed in detail each and every month to HUD in the operating reports. (Exhibits "5" and "6".)

16. Although Mr. Odabashian did not state a theory on which he based his assertion that Regatta owed $1.48 million dollars, Janet L. Browder states at paragraph 4 of her December 18, 2003 Declaration attached as Exhibit 22 to the Federal Defendant's Motion that HUD's authority was 12 U.S.C. § 1715z-4a. Upon information and belief, 12 U.S.C. § 1215z-4a(d) states:

> Notwithstanding any other statute of limitations, the Secretary may request the Attorney General to bring an action under this section at any time up to and including six years after the latest date that the Secretary discovers any use of project assets in income in violation of the regulatory agreement or any applicable regulation.

Upon this basis, HUD knew to the extent it relied upon its own identified authority that at least $1.051,500.00 of HUD's principal claim of $1,327,420.00 and most of HUD's interest claim was barred by the statute of limitations. As described above, Ms. Browder and HUD also knew, or should have known, that HUD had waived any objection to this ten-year course of performance ten years ago and that HUD waived any objections to this thirteen year course of performance seven years ago. HUD also knew or should have known that the non-payment of HUD's demand was not a violation. HUD showed Affiant no flexibility in pursuit of the demand in its March 24, 2000 letter despite the incorrectness of HUD's assumed fact and baseless demand. (Exhibits "4" and "6".)

17. Mr. Odabashian's statements at Exhibit "6" contain the admissions described above,

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

but many of his statements are also incorrect. For example, HUD did not disallow "withdrawals" of funds over $10,000.00 from 1985 through 1994. Nonetheless, his description acknowledges that HUD had no objection to the arrangements of repayments of the loans at the time but only attempts to object for the first time to the amounts of these repayments made from 1985 through 1994. His letter also shows that in 2000 HUD for the first time attempted to label as "violations", "material breaches" or "continuing material breaches" any of the repayments to Rosequist of his advances under his working capital loan made at prime rate to Regatta Bay. HUD encouraged the maintenance of the revolving working capital loan arrangement during the course of Regatta Bay's performance with its lender and with HUD for maintaining the mortgage payments as current, for making needed repairs and for other needs, all as reported in certified annual audits and monthly operating reports on HUD's forms. Further, HUD waived any objection to the arrangement by acquiescence and accepted this course of performance which did not put HUD at risk because the process facilitated the cash flow needs of the property, including the maintenance of payments as current of the HUD insured mortgage, which was consistent with HUD's policy. Discovery from the source of information for Mr. Odabashian's letter should further confirm these facts. (Exhibit "6".)

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

18. HUD has never provided a meaningful, correct analysis of how it could recover any money from Regatta Bay under the statute HUD now cites such as would put Regatta Bay on notice of specifically what the alleged "continuing material breach" was. Instead, HUD used its incorrect interpretation of the above quoted statute to intimidate Regatta Bay and to wrongfully foreclose on the Regatta Bay Apartments.

19. Despite having received all required audited annual financial statements and monthly operating reports for the project, HUD incorrectly and/or wrongfully concluded in the August 29, 2000 letter that the payments at issue were not for allowed purposes under the Regulatory Agreement and all of its terms, including the purpose of paying reasonable operating expenses and the course of performance between HUD and Regatta Bay since 1983.

20. HUD incorrectly and/or wrongfully concluded in the August 29, 2000 letter that the payments at issue were made in violation of the Regulatory Agreement.

21. Based upon the letters at Exhibits "4" and "5", true and correct copies of which are

attached hereto, HUD incorrectly and/or wrongfully thereby declared Regatta Bay to be in default of the Regulatory Agreement, and as a result HUD then wrongfully proceeded to foreclose upon the property.

22. Regatta advised HUD of its mistake in response to HUD's May 22, 2001 letter referenced at the Federal Defendant's Motion, Exhibit 10. HUD's letter at Exhibit 10 of the Federal Defendant's Motion was at best vague and again did not reference any specific facts. Attached hereto as Exhibit "7" is a true and correct copy of Regatta's response letter, advising HUD that it had miscommunicated between its offices, that HUD was violating its own policies and that foreclosure was neither legally nor economically justified. Mr. Ewing's assessment proved to be correct that HUD was intent on foreclosing on the Regatta Bay property regardless.

23. On October 31, 2001, HUD served its Notice of Default and Foreclosure Sale (Federal Defendant's Exhibit 13), admitting that the basis of its notice of intent to accelerate in its July 19, 2000 letter was incorrect because Regatta did make the its June 2000 payment. The notice of default did not show any valid grounds for acceleration of the Note such as HUD purported to accomplish by its July 19 letter to Reilly. HUD's acceleration in July 2000 for lateness of the July payment was not justified, and it also made futile any further monthly payments by Regatta Bay. A true and correct copy of HUD's Notice of Default dated August 29, 2000 at Exhibit "5" shows that the only basis for HUD's default notice was the wrongful demand that Regatta pay $1.48 million dollars forthwith.

JOHN PETF" LEE, LTD.
ATTORN. AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

24. Regatta Bay filed for Chapter 11 bankruptcy protection on September 8, 2000, a true and correct copy of the first page of Regatta Bay's Voluntary Petition attached hereto as Exhibit "8", disputed by HUD at page 8, lines 2 through 6, incorrectly suggesting Regatta Bay's filing date to be December 2000, and incorrectly implying an improper purpose by Regatta Bay in its Chapter 11 filing, which HUD sarcastically refers to as "different course of action".

25. HUD's filing of a Proof of Claim on February 21, 2001 in the amount of $3,062,808.63 is irrelevant except for the fact that HUD stood fast on its wrongful demand, acceleration and declaration of default which HUD relied upon in the bankruptcy case to argue nonfeasibility of Regatta's reorganization to lift the stay to effectuate its wrongful foreclosure.

26. The bankruptcy court order lifting the stay at the Federal Defendant's Exhibit 17 shows the grounds stated by the court to have been Bankruptcy Code § 362(d)(2) and (3). Regatta Bay was unsuccessful sustaining its burden of showing a reasonable possibility of confirming its Chapter 11 reorganization plan. This was in large part because of the increased vacancy rates and decreased income caused by the lack of funding available upon HUD's wrongful notice of acceleration of the Note and wrongful declaration of default which underlay HUD's wrongful foreclosure and motion to lift the stay. In retrospect, the reorganization never had a chance because of HUD's intent to wrongfully foreclose on the property and the resulting harm to the cash flow management through restrictions on the use of cash collateral and the tailspinning occupancy rates which resulted. Discovery should further confirm these facts which are also illustrated in part by pleadings before the bankruptcy court such as Regatta Bay's Disclosure Statement as well as the monthly operating reports. (Federal Defendant's Exhibits 17 and 18.) Regatta Bay voluntarily moved to dismiss the Chapter 11 case once the stay was lifted and HUD proceeded with its wrongful foreclosure.

JOHN PETE** LEE, LTD.
ATTORN AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

27. As a result of HUD's wrongful declaration of default and requirement that Regatta Bay pay in excess of $1.48 million to the project, Regatta Bay lost the property, including its right to enjoy the ongoing appreciation of the property from its past and future, planned capital improvement expenditures and long term maintenance, including the installation of a greatly improved traffic configuration known from experience of other HUD projects in the area to provide enhanced security and value to the subject apartments, also described in the Chapter 11 Disclosure Statement. Discovery should further confirm these facts.

28. The loss of these rights of Regatta Bay by HUD's wrongful foreclosure caused Regatta Bay also to lose the value associated with such security, occupancy and the concomitant increase in rental income and value

29. As Affiant explained to HUD on numerous occasions, such increased occupancy and rent was highly probable, if not certain, had HUD not wrongfully accelerated the Deed of Trust Note, declared the Regulatory Agreement to be in default and foreclosed on the property.

30. Attached hereto as Exhibit "9" is a true and correct copy of the claim Regatta Bay

served upon HUD on or about August 26, 2002. Other than to acknowledge receipt of this claim, HUD never provided Regatta Bay with a response, not even a denial letter by February 26, 2002, some time after which or when Regatta Bay treated HUD's failure to respond as a denial under 28 U.S.C. § 2401(b).

31. HUD sold the Regatta Bay Apartments at foreclosure sale on December 4, 2001.

32. The purchaser of the Regatta Bay Apartments at the foreclosure sale, Ali Moghadam, informed Affiant after the sale that Mr. Moghadam would have bid up to $4 million on the property at the foreclosure sale of December 4, 2001, which discovery should further confirm. On this basis, the distress price of the property at the sale date shows that a willing buyer would have paid a distressed seller more than the price which was obtained and that the foreclosure sale price did not reflect the fair market value of Regatta's property upon which HUD foreclosed but instead reflected a much lower price.

JOHN PETE" LEE, LTD.
ATTORN. AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

33. As Regatta Bay stated in its August 26, 2002 claim to HUD, Regatta Bay sustained injury as a direct result of HUD's wrongful declaration of default and wrongful foreclosure in an amount to be calculated and introduced at trial. Such amount was calculated as of the date of submittal of Regatta's claim to HUD as of August 23, 2002 at $1,994,536.11 based upon the following computations as of that date:

| | |
|---|---|
| Value of Property | $5,149, 696.20 |
| Less Surplus Received From Foreclosure | $ 155,091.57 |
| Less Principal Balance Eliminated Through Foreclosure | $3,062,808.63 |
| Plus Attorney's Fees Incurred in Mitigation of Damages Resulting From the Wrongful Foreclosure | $ 62,740.11 |
| Total Loss From Wrongful Foreclosure Quantifiable as of August 23, 2002 | $1,994,536.11 |

34. The loss sustained by Regatta Bay is greater today than when Regatta Bay submitted its claim to HUD on or about August 26, 2002. Regatta has incurred additional attorney's fees, and the value of the property has increased, which increase is confirmed by the Clark County Assessor's records and should be further confirmed by discovery, including the obtaining of an appraisal.

35. Regatta Bay's damages will be calculated by deducting from the value of the property

as of the date of trial the surplus funds received from foreclosure after the loan was paid off from the sale proceeds, less the benefit of full payment of the principal secured by the deed of trust, plus attorney's fees incurred in mitigation of damages from the wrongful foreclosure and other damages allowable by law.

36. The attorney's fees referenced above were incurred by John Peter Lee, Ltd. in Regatta Bay's efforts to mitigate damages caused by the wrongful foreclosure.

37. These efforts included the filing of a Chapter 11 reorganization plan and ongoing efforts to persuade HUD to recognize the injury caused to Regatta Bay from HUD's wrongful foreclosure.

38. The principal amount was stated as a payoff by HUD for the foreclosure sale which occurred on December 4, 2001.

39. The internet site of the Clark County, Nevada Assessor's Office, M.W. Schoffield, stated the taxable value of the property as of August 23, 2002, to be $4,068,260.00. A true and correct copy of a printout of that date from that site pertaining to the subject property is attached hereto as Exhibit "10".

40. The Assessor's Office stated to Regatta Bay and/or its counsel on or about August 26, 2002, that the taxable value is based upon an approximation of seventy-nine percent (79%) of the market value. Discovery should further confirm this fact, including the obtaining of an appraisal.

41. Accordingly, this information from the Clark County, Nevada Assessor's Office shows the value of the subject apartments to be $5,149,696.20 as of August 23, 2002. As of July 30, 2003, the Assessor's Office states at its internet site that the taxable value of the property is $4,220,930.00, such that the value of the property is computed under this method at $5,342,949.00.36. A true and correct copy of a printout of that date from that site pertaining to the subject property is attached hereto as Exhibit "11". The actual value may be higher under this method than the assessor's calculation and will be determined at trial.

42. The updated loss calculation based upon the Assessor's records as of July 30, 2003, not including additional attorney's fees incurred since August 23, 2002, is a minimum of $2,187,789.27.

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

43. To the extent any additional evidence is essential to establish or support these facts, Regatta Bay needs and requests an opportunity to conduct discovery. Additional discovery should further tend to confirm these facts, including HUD's production of the Inspector General's audit of Regatta Bay and all correspondence relating to HUD's allegations that Regatta Bay defaulted in any way as would justify HUD's declaration of default and foreclosure, and depositions of David Ewing, Janet Browder, Ali Moghadam, HUD's custodian of records, and person(s) most knowledgeable pertaining to Regatta Bay and any undisclosed witnesses HUD would use to support its defense.

44. The discovery identified which Regatta Bay still wishes to conduct should further show HUD's detailed, contemporaneous knowledge of Regatta Bay's accounting practices from the Inspector General's December 20, 1993 audit, the source of information for Mr. Odabashian's letter at Exhibit "6" and related correspondence regarding Regatta's money transactions, including the parties' course of performance and conduct for the arrangements for the revolving working capital loans by the General Partner to facilitate cash flow and the various needs of the property, including maintenance and the keeping of the HUD-insured mortgage current and performing. The depositions of David Ewing, Janet Browder, HUD's custodian of records and person(s) most knowledgeable about Regatta Bay should also show HUD's knowledge of the course of performance and conduct between Regatta Bay, the lender and HUD, including the revolving working capital loans. The deposition of Ali Moghadam should show his willingness to have paid substantially more for the property at the foreclosure sale than the $3.6 million price he paid, up to $4 million. The obtaining of an appraisal should show the actual market value of the property.

FURTHERMORE, Affiant sayeth naught.

PHIL R. ROSEQUIST

SUBSCRIBED and SWORN to before me this 5th day of March, 2004.

NOTARY PUBLIC in and for said County and State

LAURIE ALDERMAN
Notary Public State of Nevada
No. 97-3895-1
My appt. exp. Oct. 9, 2005

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

**CERTIFICATE OF MAILING**

I hereby certify that on the 5th day of March, 2004, I served a copy of the above and foregoing Affidavit of Phil R. Rosequist in the above captioned matter by enclosing it in a sealed envelope upon which first class postage was fully prepaid addressed to:

DANIEL G. BOGDEN
United States Attorney
RIMANTAS A. RUKSTELE
Assistant United States Attorney
333 Las Vegas Boulevard South
Suite 500
Las Vegas, NV 89101

That there is regular communication by mail between the place of mailing and the place so addressed.

An Employee of JOHN PETER LEE, LTD.

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NEVADA 89101
Telephone (702) 382-4044
Telecopier (702) 383-9950

# EXHIBIT "1"

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

Project No.: 125-35073-PM HAP CONTRACT NO.: SF 1525

Mortgagee WEYERHAEUSER MORTGAGE COMPANY

Amount of Mortgage Note $3,685,100.00 Date September 1, 1

Mortgage: Recorded: Concurrently herewith State Nevada County Clark Date

Book Page

Originally endorsed for insurance under Section 221(d)(4) of the National Housing Act.

This Agreement entered into this 1st day of September , 1979 , between
Regatta Apartments, a Nevada limited partnership
whose address is
P. O. Box 980, Las Vegas, Nevada 89101

their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*.

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 1,136.00 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services included in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwishstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

* (1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national orgin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284, 82 Stat. 73)* Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts 1, 100, and 110, and Subparts I and M of Part 200)*.

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be desienated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c). Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregati...:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held:

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (c) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representativ executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: All present and future partners

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

Regatta Apartments, a Nevada limited partnersh
*(Owners)*

Seal

WITNESS

By Frank M. Blackburn, General Partner

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING COMMISSIONER

Original signed by:
Paul R. Kaup

By ____________________
*(Authorized Agent)*

*(Add proper acknowledgements)*





★ US GOVERNMENT PRINTING OFFICE: 1975-

STATE OF NEVADA )
) SS
COUNTY OF CLARK )

On September 21, 1979

before me, the undersigned, a Notary Public in and for said State, personally appeared Frank M. Blackburn known to me to be one of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

Signature *Joanna M. Rink*

OFFICIAL SEAL
JOANNA M. RINK
NOTARY PUBLIC - STATE OF NEVADA
COUNTY OF CLARK
My Appt. Expires Mar. 16, 1983

STATE OF CALIFORNIA )
) SS
COUNTY OF *SAN FRANCISCO* )

On September *25*, 1979 before me, the undersigned, a Notary Public in and for said State, personally appeared *PAUL R. KAUP* known to me to be the authorized agent of the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner ________, known to me to be the person ________ whose name is subscribed to the within instrument and acknowledged that he executed the same.

WITNESS my hand and official seal.

Signature *[signature]*

Walter Duncan, Jr.

Name (Typed or Printed)

OFFICIAL SEAL
WALTER DUNCAN JR.
NOTARY PUBLIC • CALIFORNIA
SAN FRANCISCO COUNTY
My comm. expires NOV 8, 1981

519 Laguna Street, San Francisco, CA 94102

SCHEDULE "A"

Attached hereto and made a part of that certain Regulatory Agreement by and between REGATTA APARTMENTS, a limited partnership and the SECRETARY OF HOUSING AND URBAN DEVELOPMENT

Situate in the County of Clark, State of Nevada, described as follows: A portion of the East Half (E½) of Government Lot 2, Section 19, T.20 S., R. 62 E., M.D.M., Clark County, Nevada, more particularly described as follows:

COMMENCING at the Southeast corner of said Government Lot 2; thence N. 01°03'25" W., along the Easterly line thereof, 425.05 feet to the TRUE POINT OF BEGINNING; thence continuing N. 01°03'25"W., 329.32 feet to a point on the Southerly boundary of Regatta Estates as shown by a plat on file as Book 22 of Plats, Page 98, on file in the Clark County, Nevada Official Records; thence along the said Southerly boundary the following courses: S. 88°56'35" W., 140.00 feet; N. 01°03'25" W., 457.72 feet; N. 89°38'21" W., 529.77 feet to a point on the West line of the aforesaid East Half (E½) of the Government Lot 2; thence along said line, S. 00°52'52" E., 503.92 feet; thence departing said line, S. 89°33'46" E., 314.35 feet; thence S. 00°44'27" E., 278.69 feet; thence S. 89°33'46" E., 358.57 feet to the TRUE POINT OF BEGINNING.

CERTIFIED TRUE AND CORRECT COPY OF Regulatory Agreement

RECORDED ON Sept. 27, 1991 IN THE OFFICE OF THE COUNTY

RECORDER OF Clark COUNTY AS DOCUMENT NO. 1083581, Bk 1124

E.J. Chiarelli