# EXHIBIT "9"

JOHN PETER LEE, LTD.
ATTORNEYS AT LAW
830 LAS VEGAS BOULEVARD SOUTH
LAS VEGAS, NEVADA 89101
TELEPHONE (702) 382-4044
FACSIMILE (702) 383-9950
E-MAIL: info@johnpeterlee.com

August 26, 2002

HUD-Las Vegas Office
333 North Rancho Drive
Suite 700
Las Vegas, NV 89106

Dear Sir/Madam:

This office has been retained to act as the counsel for Regatta Bay, Ltd. Enclosed please find a Claim for Damage, Injury, or Death being hereby presented by Regatta Bay, Ltd. under the Federal Tort Claims Act. Please note that the claim is for wrongful foreclosure. To the degree declaratory relief and/or breach of contract actions lie, Regatta Bay, Ltd. reserves its right to seek remedies for such causes of action in the appropriate forum.

The Claim for Damage, Injury, or Death Standard Form 95 does not include instructions for this type of case of a claim for wrongful foreclosure. Nonetheless, we have completed the form and tailored the facts of this case as reasonably as possible to the requested information on the form.

Regatta Bay, Ltd.'s demand is for the sum certain of $1,994,536.11. This amount will increase as the property value increases, which in turn increases the loss to Regatta Bay, Ltd. from the wrongful foreclosure by HUD.

Your cooperation in expeditiously processing and paying this claim in full will be appreciated.

Very truly yours,

JOHN PETER LEE, LTD.

PAUL C. RAY, ESQ.

PCR/dp
604.022029
cc: Regatta Bay, Ltd.

# CLAIM FOR DAMAGE, INJURY, OR DEATH

**INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED OMB NO. 1105-0008 EXPIRES 6-30-01

1. Submit To Appropriate Federal Agency:
U.S. Department of Housing & Urban Development
Washington, D.C. 20410-8000

2. Name, Address of claimant and claimant's personal representative, if any. *(See instructions on reverse.) (Number, street, city, State and Zip Code)*
Regatta Bay, Ltd.
c/o John Peter Lee, Ltd.
830 Las Vegas Blvd. So.
Las Vegas, NV. 89101

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME *(A.M. OR P.M)* |
|---|---|---|---|---|
| MILITARY CIVILIAN NONE | NONE | NONE | NONE | NONE |

8. Basis of Claim *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)*

See attachment.

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT *(Number, street, city, State, and Zip Code)*

NONE

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. *(See instructions on reverse side)* Regatta Apartments; wrongful foreclosure of entire project located at 2101 Sandy Lane, Las Vegas, Nevada 89115.

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT

NONE

11. **WITNESSES**

| NAME | ADDRESS *(Number, street, city, State, and Zip Code)* |
|---|---|
| Robert Rosequist | c/o Associated Brokers, 3401 W. Charleston Blvd. Las Vegas, NV 89102 |
| David Ewing | 333 N. Rancho Road, Suite 700, Las Vegas, NV |

12. *(See instructions on reverse)* **AMOUNT OF CLAIM** *(in dollars)*

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
|---|---|---|---|
| $1,994,536.11 | NONE | NONE | $1,994,536.11 |

**I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM**

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| [signature] | (702) 491-3454 | 8-26-02 |

**CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM**

The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 31 U.S.C. 3729.)*

**CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS**

Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 18 U.S.C.A. 287.)*

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority.* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

**Complete all items – Insert the word NONE where applicable**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim And may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC 20503

## INSURANCE COVERAGE

In order that subrogation claims be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? Yes, if yes give name and address of insurance company (*Number, street, city, State, and Zip Code*) and policy number. No

NONE

16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?

NONE

17. If deductible, state amount

NONE

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? (*It is necessary that you ascertain these facts*)

NONE

19. Do you carry public liability and property damage insurance? Yes, If yes, give name and address of insurance carrier (*Number, street, city, State, and Zip Code*) No

NONE



* U.S. GOVERNMENT PRINTING OFFICE: 1989--241-175

BASIS OF CLAIM

On or about November 2, 1983, the claimant, Regatta Bay, Ltd. acquired title to the subject property, Regatta Bay Apartments located at 2101 Sandy Lane, Las Vegas, Nevada 89115. Regatta Bay, Ltd. acquired the apartments subject to a deed of trust for the original principal sum of $3,685,100.00, and Regatta Bay, Ltd. assumed a Regulatory Agreement for Insured Multi-Family Housing Projects signed by HUD's authorized agent, Paul R. Kaup, on or about September 25, 1979. To purchase the apartments Regatta Bay, Ltd. assumed the principal balance and paid an additional $1,492,750.00.

On or about March 24, 2000, Janet Browder, Director, multi-family HUD, and Scott Hunley, Director, DEC, Los Angeles, Satellite Office for HUD, sent a letter to Regatta Bay, Ltd. requiring Regatta Bay, Ltd. to address HUD's concerns about the apartments within thirty (30) days. Following a review of Regatta Bay, Ltd.'s response, on or about August 29, 2000, Frank M. Malone, Director of Multi-Family Asset Management for HUD, sent a letter notifying Regatta Bay, Ltd. that HUD concluded Regatta Bay, Ltd. to be in violation of the Regulatory Agreement. The only two bases stated by Mr. Malone were the incorrect conclusions that: 1) payments of $1,327,424.00 and charges for interest of $152,665.00 and 2) failure to pay such amounts, at that time allegedly constituted violations of the Regulatory Agreement. Despite having received all required audited annual financial statements for the project, HUD wrongfully concluded that the payments at issue were not for the purpose of paying reasonable operating expenses. Copies of the March 24, 2000 letter requiring Regatta Bay, Ltd. to pay these funds, the August 29, 2000 letter declaring Regatta Bay, Ltd. to be in violation of the Regulatory Agreement are enclosed herewith.

HUD wrongfully thereby declared Regatta Bay, Ltd. to be in default of the Regulatory Agreement, and as a result HUD then wrongfully proceeded to foreclose upon the property. As a

result of HUD's wrongful declaration of default and requirement that Regatta Bay, Ltd. pay in excess of $1.3 million to the project, Regatta Bay, Ltd. lost the property, including its right to enjoy the ongoing appreciation of the property from its planned capital improvement expenditures and long term maintenance, including the installation of a greatly improved traffic configuration known from experience of other HUD projects in the area to provide security and value in the crime-ridden area of the subject apartments. The loss of these rights to Regatta Bay, Ltd. caused Regatta Bay, Ltd. also to lose the value associated with such security, occupancy and the concomitant increase in rental income. As was explained to HUD on numerous occasions, such increased occupancy and rent was a reasonable certainty had HUD not wrongfully declared the Regulatory Agreement to be in default and wrongfully foreclosed on the property.

Regatta Bay, Ltd. sustained the following loss as a direct result of HUD's wrongful declaration of default and wrongful foreclosure:

| | |
|---|---|
| Value of Property | $5,149, 696.20 |
| Less Surplus Received From Foreclosure | $ 155,091.57 |
| Less Principal Balance Eliminated Through Foreclosure | $3,062,808.63 |
| Plus Attorney's Fees Incurred in Mitigation of Damages Resulting From the Wrongful Foreclosure | $ 62,740.11 |
| Total Loss From Wrongful Foreclosure Quantifiable as of August 23, 2002 | $1,994,536.11 |

Regatta Bay, Ltd.'s damages are calculated by deducting from the present day value of the property the surplus funds received from foreclosure after the loan was paid off from the sale proceeds, less the benefit of full payment of the principal secured by the deed of trust, plus attorney's fees incurred in mitigation of damages from the wrongful foreclosure. The attorney's fees were incurred by John Peter Lee, Ltd. in Regatta Bay, Ltd.'s efforts to mitigate damages caused by the

wrongful foreclosure. These efforts included the filing of a Chapter 11 reorganization plan and ongoing efforts to persuade HUD to recognize the injury caused to Regatta Bay, Ltd. from HUD's wrongful foreclosure. The principal amount was stated as a payoff by HUD for the foreclosure sale.

Also enclosed herewith are statements from the internet site of the Clark County, Nevada Assessor's Office, M.W. Schoffield, and from 2001 Sales Comparables, Las Vegas, Nevada by Hendricks & Partners. M.W. Schoffield, the Clark County, Nevada Assessor, stated the taxable value of the property at its internet site as of August 23, 2002, to be $4,068,260.00. The Assessor's Office stated to Regatta Bay, Ltd.'s counsel on August 26, 2002, that the taxable value is based upon an approximation of seventy-nine percent (79%) of the market value. Accordingly, the just and correct information from the Clark County, Nevada Assessor's Office shows the value to be $5,149,696.20. Regatta Bay, Ltd. reserves its right to recover for additional damages resulting from the increase of value over time, which increase is reasonably certain to occur and which increase is a loss to Regatta Bay, Ltd. caused by the wrongful foreclosure by HUD.

Alternatively, the entry from the enclosed 2001 Sales Comparables, Las Vegas, Nevada, for Adobe Villas shows that in August, 2001, approximately four months before the subject foreclosure sale, a similar project approximately three hundred feet away from the subject project sold at the price of $40,909.00 per unit. Application of this market value per-unit price to the instant project yields a total value of the instant project of $4,909,080.00 on the full 120 units, consistent with the Clark County Assessor's official statement of the taxable value.

RECEIVED
MAR 27 2000

U.S. Department of Housing and Urban Development
Departmental Enforcement Center
Los Angeles Satellite Office
611 West Sixth Street, Suite 3800
Los Angeles, CA 90017

MAR 24 2000

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Regatta Bay, Ltd., a Nevada Limited Partnership
Attention: Mr. Phil R. Rosequist, General Partner
3401 W. Charleston Boulevard
Las Vegas, NV 89102

SUBJECT: Notice of Violations and Demand for Corrective Action
Project Name: Regatta Apartments
Project Number: 125-35152

Dear Mr. Rosequist:

Pursuant to Paragraph 14 of the Regulatory Agreement for Insured Multi-Family Housing Projects under Section 221(d)(4) of the National Housing Act, this letter constitutes formal notice by the Secretary of the Department of Housing and Urban Development (HUD) that Regatta Bay Ltd., (Owner) is in violation of its obligations under the Regulatory Agreement dated September 1, 1979. Specifically, HUD finds that the Owner is in violation of:

1. Paragraph 8(b) and (e) of the Regulatory Agreement which prohibits Owner, without the prior written approval of the Secretary, from disposing of any personal property of the project or paying out any funds, or making any distributions of assets except from surplus cash, except for reasonable operating expenses and necessary repairs. A review of the project's file by HUD's Departmental Enforcement Center (DEC) indicated that Owner, from 1985 to 1997 and without prior written HUD approval, withdrew $1,327,420 from project funds to reimburse itself for prior advances to the operating fund, when the project was in a cash deficit or no surplus cash position.

2. Paragraph 10 of the Regulatory Agreement which requires Owner to maintain the premises in good repair and condition. An inspection of the property by HUD's Real Estate Assessment Center (REAC) on September 13, 1999, disclosed several physical deficiencies such as missing or inoperable smoke detectors, missing or inoperable fire extinguishers and misplaced security bars, giving the project a score of 42c.

MAR 27 2000

In addition to the above violations, a review by the DEC of the project's file indicated that Owner, from 1985 to 1997 and without prior written HUD approval, charged the project $152,665 in compound interest, ranging from 6% to 11%, on Owner's advances made to the project when the project was in a cash deficit or no surplus cash position. Further, a comprehensive management review conducted by the DEC from September 13 to 17, 1999 also revealed that several other deficiencies exist on the property. These deficiencies are described in detail in Exhibit A, attached.

As a result of the above described violations and findings, HUD hereby requires the Owner to address the above described concerns at the projects and that the following tasks be completed within thirty (30) days from the date of this letter:

1. Owner will reimburse the project $1,327,420 for the unauthorized withdrawal of project funds. Project funds of Regatta Apartments may not be used for this purpose except to the extent that the project has surplus cash as defined in Paragraph 16(f) of the Regulatory Agreement. You will note that the Owner may not make, receive and retain any distribution of income of any kind as long as there are still outstanding requirements for repairs and maintenance on the projects and until the unauthorized withdrawals have been reimbursed.

2. Owner shall take appropriate corrective action on the deficiencies noted in the HUD REAC Physical Inspection Report, and to certify to HUD in writing that those deficiencies, which are listed under "Inspected Items" on pages 3 to 8 of the Inspection Report, have been corrected.

3. Owner will instruct the Realty Management Company to make a reversing journal entry in the project books and records, to eliminate the improperly accrued interest that Owner charged to the project as payable to Owner in the amount of $152,665.

4. Owner will submit a Management Improvement Operating (MIO) Plan showing all the needed repairs, including required corrections to all of the deficiencies noted in the REAC inspection, as well as the deficiencies observed during the DEC's Comprehensive Management Review (see Attachment A, Exhibit 2). The MIO Plan must be submitted in the prescribed format in HUD Handbook 4355.1, Flexible Subsidy, Form HUD-9835 and Form HUD-9835-A.

Each of the submissions should be directed to both the San Francisco Hub at 450 Golden Gate Avenue, San Francisco, California 94102-3448 to the attention of Janet Browder, Director of Housing and the Los Angeles Departmental Enforcement Center at 611 W. 6th Street, Suite 3800, Los Angeles, California 90017 to the attention of Scott Hunley, Director of Operations.

MAR 27 2000

The failure to comply with any or all of the actions required herein could result in the suspension or abatement of any federal assistance, or the imposition of administrative, civil sanction or other corrective action the DEC deems appropriate under the circumstances.

If you have any questions, please contact Roger Balane, Enforcement Analyst at (213) 894-4282, extension 4019.

Janet Browder
Director
SF Multifamily Hub

Scott Hunley
Director
DEC Los Angeles Satellite Office

Enclosure

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

RECEIVED
SEP 05 2000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

AUG 29 2000

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Sheldon L. Schreiberg, Esq.
Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, D.C. 20005-2004

SUBJECT: Notice of Default
Project Name: Regatta Apartments
Project Numbers: 125-35152

Dear Mr. Schreiberg:

On March 24, 2000, the Department of Housing and Urban Development notified your client Regatta Bay Ltd., (Owner) that it is in violation of its obligations under the Regulatory Agreement in this matter. Specifically, you were notified that Owner is in violation of Paragraph 8(b) and (e) and Paragraph 10 of said Agreement.

A response to the Department's Notice of Violations was required within thirty (30) days from the date of the notice. Your client requested, and was given, a fifteen (15) day extension to respond. Your first response dated May 9, 2000 was received in this office on May 16, 2000. Your second response dated May 15, 2000 was received in this office on May 17, 2000.

After a thorough review of your letters and accompanying documents, HUD finds that, as to the physical issues, your responses adequately addressed the physical deficiencies raised by the REAC inspection dated September 13, 1999 and HUD's request for a MIO Plan. However, as to the financial matters, HUD finds that your responses did not satisfactorily address the financial issues raised in the Department's Notice of Violations. Namely, that HUD required the Owner to reimburse the project $1,327,420 for the unauthorized withdrawal of project funds and to instruct the Realty Management Company to reverse journal entries in the project books and records to eliminate improperly accrued interest due Owner in the amount of $152,665.

With respect to the $1,327,424 in withdrawals, your May 9, 2000 response only stated: "The owner cannot waste precious resources in disputing the allegations in enormous detail. Simply, the funds were utilized to address project needs and timing of the withdrawals was,

SEP 0 5 2000

perhaps, not appropriate, even, if approved by HUD." Please note that, regardless of the timing, HUD did not approve those withdrawals. In any event, a conclusory statement that "the funds were utilized to address the project needs", without more, is insufficient to respond to HUD's request. Your May 15, 2000 response did not address this issue.

With respect to the $152,665 of interest improperly charged to the project, neither your May 9, 2000 letter nor your May 15, 2000 letter addressed this issue.

We appreciate your statements concerning your commitment to work with HUD to resolve problems in a practical, rather than punitive, manner. We also appreciate your stated intentions to work with HUD in achieving a transfer of the property. However, to date, we have not received the required application for HUD's approval of a Transfer of Physical Assets (TPA) or any other evidence that such a transfer is being effected. We request that you submit any TPA application or other correspondence regarding a sale of the project to this office rather than the Las Vegas HUD office. Please also note that a TPA will not be approved by HUD unless plans are in place to address the project's physical and financial needs and such plans have been approved by HUD in writing.

As a result of the above and after due consideration, the Secretary has, pursuant to Paragraph 14 of the Regulatory Agreement, declared the Owner to be in default of said Regulatory Agreement. Such default is based on violations of paragraphs 8(b) and (e) of the Regulatory Agreement. As an immediate effect of the default, the Department intends to take other enforcement actions which may include, but not be limited to, the imposition of other administrative and/or civil sanctions as determined appropriate by the Department.

If you have any questions concerning this matter, please contact Roger Balane, Enforcement Analyst, at (213) 894-4282 x4019.

for Frank M. Malone
Director,
Multifamily Asset Management

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

# REGULATORY AGREEMENT FOR INSURED MULTI-FAMILY HOUSING PROJECTS

*(With Section 8 Housing Assistance Payments Contracts)*

Project No.: 125-35073-PM HAP CONTRACT NO.: SF 1525

Mortgagee WEYERHAEUSER MORTGAGE COMPANY

Amount of Mortgage Note $3,685,100.00 Date September 1, 197

Mortgage: Recorded: Concurrently herewith State Nevada County Clark Date

Book Page

Originally endorsed for insurance under Section 221(d)(4) of the National Housing Act.

This Agreement entered into this 1st day of September, 1979, between Regatta Apartments, a Nevada limited partnership whose address is P. O. Box 980, Las Vegas, Nevada 89101

their successors, heirs, and assigns *(jointly and severally, hereinafter referred to as Owners)* and the undersigned Secretary of Housing and Urban Development and his/her successors *(hereinafter referred to as Secretary)*.

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 20 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 1,136.00 per month unless a different date or amount is approved in writing by the Secretary. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorized the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maining the fund is approved in writing by the Secretary.

   (c) If Owners are a nonprofit entity or a limited distribution mortgagor, Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, with 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Secretary, and shall be disbursed only on the direction of the Secretary, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. Except as provided in Paragraph 5 hereof:

   (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

   (b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or

services which may be furnished by the Owners or others to such tenant upon his/her request, in addition to the facilities and services included in the approval rental schedule.

(c) The Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes *(other than income taxes)* and operating and maintenance cost over which Owners have no effective control, or

(ii) Deny the increase stating the reasons therefor.

5. (a) The criteria governing eligibility of tenants for admission to Section 8 units and the conditions of continued occupancy shall be in accordance with the Housing Assistance Payments Contract.

(b) The maximum rent for each Section 8 unit is stated in the Housing Assistance Payments Contract and adjustments in such rents shall be made in accordance with the terms of the Housing Assistance Payments Contract.

(c) Nothing contained herein shall be construed to relieve the Owners of any obligations under the Housing Assistance Payments Contract.

6. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Section 231, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family. In the event the mortgage is insured under Section 231, Owners will give preference or priority of opportunity to occupy its dwelling accommodations to elderly persons and handicapped persons as defined in the HUD Regulations.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to otherwise eligible displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any unrented units may be rented to non-preferred applicants; and

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Notwishstanding the provisions of paragraphs (1) and (2), for 30% of the Section 8 units, the Section 221 or Section 231 occupancy preference shall be accorded only to those individuals qualifying as very low income as specified in the Housing Assistance Payments Contract.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

7. Nonprofit Owners agree that no dividends of any nature whatsoever will be paid on the capital stock issued by the corporation.

8. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; and, in the case of a limited distribution mortgagor, all distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Secretary which shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent, plus a security deposit in an amount not in excess of one month's rent *(the gross family contribution in Section 8 units)* to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

9. (a) Owners have executed an Agreement to enter into a Housing Assistance Payments Contract or have executed a Housing Assistance Payments Contract if an insurance upon completion case. The terms of said Contract are or shall be incorporated by reference into this Regulatory Agreement.

(b) A violation of the terms of the Housing Assistance Payments Contract may be construed to constitute a default hereunder in the sole discretion of the Secretary.

(c) In the event said Housing Assistance Payments Contract expires or terminates before the expiration or termination of this Agreement, the provisions of this paragraph 9 and any other reference to said contract, to Section 8 and to Section 8 units contained herein shall be self-cancelling and shall no longer be effective as of the date of the expiration or termination of the Housing Assistance Payments Contract.

10. Owners shall maintain the mortgaged permises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

11. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

12. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or duly authorized agents of the Secretary. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or duly authorized agents of the Secretary.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year, the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, or duly authorized agents of the Secretary, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contract, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by Paragraph 8(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If mortgage is insured under Section 231, Owners or Lessee shall at all times maintain in full force and effect from the State or other licensing authority such license as may be required to operate the project as housing for the elderly.

13. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national orgin, including Title VI of the Civil Rights Act of 1964 *(Public Law 88-352, 78 Stat. 241)*, Title VIII of the Civil Rights Act of 1968 *(Public Law 90-284,82 Stat. 73)* Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities *(including 24 CFR Parts 1, 100, and 110, and Subparts I and M of Part 200)*.

14. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

15. As security for the payment due under this Agreement to the reserve fund for replacement, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profit, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

16. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage," "Security Instrument," and any other security for the note identified herein and endorsed for insurance or held by the Secretary:

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners, their successors, heirs and assigns";

(d) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" *(profit-motivated Owner)* or "Residual Receipts" *(nonprofit Owner)* means any cash remaining at the end of a semiannual and annual fiscal period after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the sum of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held:

(g) "Residual Receipts" *(limited distribution mortgagor)* means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of distributions as that term is defined below and as limited by Paragraph 8 (e) hereof;

(h) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 8 (e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(i) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to the satisfaction of the Secretary within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(j) "Section 8 units" refers to units assisted under Section 8 of the United States Housing Act of 1937 pursuant to a Housing Assistance Payments Contract.

(k) "Housing Assistance Payments Contract" refers to a written contract between the Owner and HUD, or the Owner and a Public Housing Agency, or the Owner and a Housing Finance Agency for the purpose of providing housing assistance payments to the Owner on behalf of eligible families under Section 8 of the United States Housing Act of 1937.

(l) "Displaced persons or families" shall means a family or families, or a person, displaced from an urban renewal area, or as a result of government action, or as a result of a major disaster, as determined by the President pursuant to the Disaster Relief Act of 1970.

(m) "Elderly persons" means any person, married or single, who is sixty-two years of age or over.

17. This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representativ- executors, administrators, sucessors in office or interest, and assigns, and to the Secretary and successors of the Secretary so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or obligated to reinsure the mortgage.

18. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

19. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

20. The following Owners: All present and future partners

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain: and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

Regatta Apartments, a Nevada limited partner
*(Owners)*

Seal

WITNESS

By Frank M. Blackburn, General Partner

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING COMMISSIONER

Original signed by:
Paul R. Kaup

By
*(Authorized Agent)*

*(Add proper acknowledgements)*





US GOVERNMENT PRINTING OFFICE: 1978-

STATE OF NEVADA )
) SS
COUNTY OF CLARK )

On September 21, 1979

before me, the undersigned, a Notary Public in and for said State, personally appeared Frank M. Blackburn known to me to be one of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

Signature Joanna M. Rink

OFFICIAL SEAL
JOANNA M. RINK
NOTARY PUBLIC - STATE OF NEVADA
COUNTY OF CLARK
My Appt. Expires Mar. 16, 1983

STATE OF CALIFORNIA )
) SS
COUNTY OF SAN FRANCISCO )

On September 25, 1979 before me, the undersigned, a Notary Public in and for said State, personally appeared PAUL R. KAUP known to me to be the authorized agent of the Secretary of Housing and Urban Developm[ent] acting by and through the Federal Housing Commissioner ____________, known to me to be the person ________ whose name is subscribed to the within instrument and acknowledged that he executed the same.

WITNESS my hand and official seal.

Signature Walter Duncan Jr
Walter Duncan, Jr.
Name (Typed or Printed)

OFFICIAL SEAL
WALTER DUNCAN JR.
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My comm. expires NOV 8, 1981
519 Laguna Street, San Francisco, CA 94102

SCHEDULE "A"

Attached hereto and made a part of that certain Regulatory Agreement by and between REGATTA APARTMENTS, a limited partnership and the SECRETARY OF HOUSING AND URBAN DEVELOPMENT

Situate in the County of Clark, State of Nevada, described as follows: A portion of the East Half (E½) of Government Lot 2, Section 19, T.20 S., R. 62 E., M.D.M., Clark County, Nevada, more particularly described as follows:

COMMENCING at the Southeast corner of said Government Lot 2; thence N. 01°03'25" W., along the Easterly line thereof, 425.05 feet to the TRUE POINT OF BEGINNING; thence continuing N. 01°03'25"W., 329.32 feet to a point on the Southerly boundary of Regatta Estates as shown by a plat on file as Book 22 of Plats, Page 98, on file in the Clark County, Nevada Official Records; thence along the said Southerly boundary the following courses: S. 88°56'35" W., 140.00 feet; N. 01°03'25" W., 457.72 feet; N. 89°38'21" W., 529.77 feet to a point on the West line of the aforesaid East Half (E½) of the Government Lot 2; thence along said line, S. 00°52'52" E., 503.92 feet; thence departing said line, S. 89°33'46" E., 314.35 feet; thence S. 00°44'27" E., 278.69 feet; thence S. 89°33'46" E., 358.57 feet to the TRUE POINT OF BEGINNING.

CERTIFIED TRUE AND CORRECT COPY OF Regulatory Agreement

RECORDED ON Sept. 27, 1999 IN THE OFFICE OF THE COUNTY

RECORDER OF Clark COUNTY AS DOCUMENT NO. 1083581, BK1124

E.J. Chiarelli

Search

# Clark County, Nevada

## M.W. Schofield, Assessor

# Real Property Parcel Record

| *General Information* | | | |
|---|---|---|---|
| **Parcel No.** | **Owner and Mailing Address** | **Location Address City/Township** | **Assessor Description** |
| 140-19-202-001 | MOGHADAM ALI<br>1806 E DALEY CANYON RD<br>SAN BERNARDINO CA 92404-2112 | 2101 SANDY LN<br>SUNRISE MANOR | PT GOV LOT 2<br>PT SW4 NW4 SEC 19-20-62 |

| Recorded Document No. | Recorded Date | Vesting |
|---|---|---|
| 20020125:01817 | 01/25/2002 | NO STATUS |

Click here to view the Assessor Map for this parcel number.
**Click On Parcel For Ownership History Information:** 140-19-202-001

| *Assessment Information* | | | *Supplemental Value* | | |
|---|---|---|---|---|---|
| **Tax District** | **Appraisal Year** | | **Fiscal Year** | **Supplemental Improvement Value** | **Supplemental Improvement Account Number** |
| 340 | 2002 | | 02-03 | | |

| *Real Property Assessed Value* | | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year** | **Land** | **Improvements** | **Personal Property** | **Exempt** | **Gross Assessed** | **Taxable Value Land+Imp.** |
| 2001-02 | 210000 | 632620 | 4380 | 0 | 847000 | 2407490 |
| 2002-03 | 252000 | 1171890 | 2180 | 0 | 1426070 | 4068260 |

Click here for Treasurer Information regarding real property taxes.

| *Estimated Lot Size* | *Appraisal Information* | | | |
|---|---|---|---|---|
| **Estimated Size** | **Original Const.Yr.** | **Last Sale Price Month/Year** | **Land Use** | **Dwelling Units** |
| Square Feet | 1980 | 3600000 01/02 | RESIDENTIAL APARTMENTS | 120 |
| 8.01 Acres | | | | |

******* NO RESIDENTIAL APPRAISAL RECORD FOR THIS PARCEL *******

*AssessorMap Viewing Guidelines*

**In order to view the Assessor map you must have Adobe Acrobat Reader installed on your computer system.**

**THE ADOBE ACROBAT READER IS FREE.**

**If you have the Reader installed, to view map click on the following numbers** 140192

**If you do not have the Reader it can be downloaded from the Adobe site by clicking the following button. Once you have downloaded and installed the Reader from the Adobe site, it is not necessary to perform the download a second time to access the maps.**

Get Acrobat Reader

**NOTE: THIS RECORD IS FOR ASSESSMENT USE ONLY. NO LIABILITY IS ASSUMED AS TO THE ACCURACY OF THE DATA DELINEATED HEREON.**

# 20[illegible]1 Sales Comparables

## Las Vegas, Nevada




Carl Sims
702.866.62[illegible]
csims@hpapts.com

Brian Anderson
702.866.6253
banderson@hpapts.com

Hendricks & Partners

[illegible] Fax: 702.866.6066 • 3770 Howard Hughes Parkway, Suite 135 • Las Vegas, NV 89109 • www.hendricksandpartners.com

## CLASS A PROPERTIES

**Property Specifications**

| | Property | Address | Units | # of Class | Year Built | Total SF | Unit Size | Avg. Vacancy Rate |
|---|---|---|---|---|---|---|---|---|
| 1. | Cliff @ Peace Canyon* | 4550 S. Grand Canyon | 176 | A | 2000 | 186,544 | 1060 | 35% |
| 2. | Mesa Verde | 6335 Annie Oakley | 136 | A | 1996 | 156,536 | 1,151 | 7% |
| 3. | Augusta | 10175 Spencer St. | 272 | A | 2000 | 242,688 | 892 | 10% |
| 4. | Palm Villas | 650 Whitney Ranch | 350 | A | 1991 | 321,824 | 919 | 9% |
| 5. | Borgata | 4400 S. Jones Bl. | 384 | A | 1998 | 355,992 | 927 | 10% |
| 6. | Sienna Villas | 2951 Ribbon Rd. | 360 | A | 2000 | 381,296 | 1059 | 8% |
| 7. | Deer Springs | 7855 Deer Springs Way | 272 | A | 2000 | 263,984 | 971 | 12% |
| 8. | Pacific Adagio | 7709 Vegas Dr. | 282 | A+ | 1997 | 341,784 | 1211 | 10% |
| 9. | Pacific Carlisle | 10250 Covington Cross | 274 | A+ | 1997 | 321,299 | 1173 | 10% |
| 10. | Monaco Park | 8350 W. Desert Inn Rd. | 284 | A+ | 1999 | 282,022 | 987 | 12% |

## CLASS B PROPERTIES

| | Property | Address | Units | # of Class | Year Built | Total SF | Unit Size | Avg. Vacancy Rate |
|---|---|---|---|---|---|---|---|---|
| 1. | Sahara Gardens | 4801 E. Sahara Ave. | 312 | B | 1983 | 273,963 | 878 | 8% |
| 2. | Villa de Mission | 1455 E. Katie | 226 | B | 1980 | 192,396 | 851 | 7% |
| 3. | Brittney Heights | 4855 Vegas Valley | 216 | B | 1991 | 206,428 | 956 | 7% |
| 4. | Cheyenne Trails | 3300 N. Las Vegas Blvd. | 144 | B | 1997 | 108,832 | 756 | 10% |
| 5. | Canyon View | 7400 Pirates Cove | 138 | B | 1989 | 148,980 | 1080 | 10% |
| 6. | Avion | 6901 E. Lake Mead Bl. | 352 | B | 1997 | 332,956 | 946 | 7% |
| 7. | Shelby's Creek | 3050 S. Nellis Bl. | 296 | B | 1998 | 277,808 | 939 | 9% |
| 8. | Island Club | 3700 E. Bonanza Rd. | 409 | B- | 1991 | 315,744 | 774 | 6% |

## CLASS C PROPERTIES

| | Property | Address | Units | # of Class | Year Built | Total SF | Unit Size | Avg. Vacancy Rate |
|---|---|---|---|---|---|---|---|---|
| 1. | Cheyenne Woods | 3417 E. Cheyenne | 160 | C | 1988 | 137,792 | 861 | 10% |
| 2. | La Rochelle | 4325 S. Bruce | 127 | C | 1983 | 104,521 | 823 | 7% |
| 3. | Cottonwood Creek | 3149 E. Desert Inn | 128 | C | 1984 | 103,552 | 809 | 10% |
| 4. | Desert Park | 100 S. Martin Luther King | 368 | C | 1987 | 177,121 | 481 | 12% |
| 5. | Charleston Park | 4800 E. Charleston Bl. | 200 | C | 1981 | 149,000 | 745 | 10% |
| 6. | Park Apartments | 1600 E. Rochelle | 308 | C | 1978 | 233,764 | 804 | 8% |
| 7. | Canyon Park | 5100 E. Tropicana Ave. | 340 | C | 1979 | 297,852 | 864 | 13% |
| 8. | Hamptons | 3070 S. Nellis Blvd. | 492 | C | 1988 | 444,768 | 904 | 10% |
| 9. | Adobe Villas | 3550 E. Lake Mead Dr. | 132 | C | 1985 | 125,400 | 950 | 8% |
| 10. | Woodridge Villas | 1591 Chartered Circle | 164 | C | 1988 | 171,900 | 1026 | 8% |
| 11. | Ridgewood | 3355 Arville St. | 112 | C | 1977 | 87,768 | 777 | 10% |
| 12. | Clarkdale Arms | 2417 Wengert | 135 | C | 1962 | 92,216 | 657 | 10% |
| 13. | Villa Cordova | 2800 S. Eastern | 288 | C+ | 1973 | 222,336 | 772 | 3% |
| 14. | Sunpoint Tennis Club | 2870 S. Decatur Blvd. | 110 | C+ | 1977 | 99,500 | 969 | 9% |
| 15. | Virginia | 5350 E. Tropicana Ave. | 100 | C+ | 1978 | 80,750 | 808 | 8% |

## CLASS D PROPERTY

| | Property | Address | Units | # of Class | Year Built | Total SF | Unit Size | Avg. Vacancy Rate |
|---|---|---|---|---|---|---|---|---|
| 1. | Centennial Park Arms** | 2605-2627 Donna St. | 156 | D | 1972 | 154,440 | 990 | 7% |

* Bought by Timeshare
** Tax Credit Transaction

## Sale Data

| Sale Date | Per Unit Op. Exp's | Sale Price | Cap Rate | Price Per Unit | Sales Price/ SF NRA |
|---|---|---|---|---|---|
| Jan-01 | $3,100 | $15,400,000 | N/A | $87,500 | $82.55 |
| Mar-01 | $3,225 | $9,550,000 | 9.5% | $70,220 | $61.00 |
| Jul-01 | $3,100 | $19,250,000 | 8.7% | $70,772 | $79.32 |
| Sep-01 | $3,300 | $25,500,000 | 8.95% | $72,857 | $79.24 |
| Sep-01 | $3,250 | $28,100,000 | 9% | $73,177 | $78.93 |
| Oct-01 | $2,900 | $31,000,000 | 8.67% | $86,111 | $81.30 |
| Nov-01 | $2,900 | $20,062,000 | 7.5% | $73,757 | $76.00 |
| Mar-01 | $3,400 | $25,000,000 | 8.75% | $88,652 | $73.15 |
| Mar-01 | $3,450 | $25,600,000 | 8.77% | $93,430 | $79.67 |
| Mar-01 | $3,300 | $25,276,000 | 7.81% | $89,000 | $89.62 |
| | | | | | |
| Jan-01 | $3,100 | $13,134,583 | 9.4% | $42,098 | $47.95 |
| Jan-01 | $3,100 | $9,800,000 | 9.4% | $43,363 | $50.96 |
| Feb-01 | $3,100 | $11,000,000 | 9.27% | $50,925 | $53.29 |
| Jun-01 | $3,000 | $7,200,000 | 9% | $50,000 | $66.15 |
| Sep-01 | $3,200 | $7,900,000 | 9.25% | $57,246 | $53.03 |
| Nov-01 | $3,300 | $23,200,000 | 9.5% | $65,900 | $69.68 |
| Dec-01 | $3,100 | $16,800,000 | 8.5% | $56,756 | $60.47 |
| c-01 | $3,100 | $16,657,000 | 9% | $40,726 | $52.75 |
| | | | | | |
| Jan-01 | $3,000 | $4,200,000 | 13% | $26,250 | $30.48 |
| Mar-01 | $2,990 | $4,365,000 | 10% | $34,370 | $41.76 |
| Mar-01 | $3,151 | $5,250,000 | 9.5% | $41,015 | $50.71 |
| Apr-01 | $2,950 | $9,900,000 | 11.5% | $26,902 | $55.89 |
| Apr-01 | $3,200 | $6,150,000 | 9% | $30,750 | $41.28 |
| May-01 | $3,000 | $10,750,000 | 7.5% | $34,902 | $45.98 |
| May-01 | $3,050 | $12,350,000 | 7.5% | $36,323 | $41.46 |
| Jun-01 | $3,200 | $23,370,000 | 9.3% | $47,500 | $52.54 |
| Aug-01 | $3,100 | $5,400,000 | 9% | $40,909 | $43.06 |
| Sep-01 | $3,100 | $7,425,000 | 9.91% | $45,274 | $43.19 |
| Dec-01 | $3,100 | $4,175,000 | 10% | $37,277 | $47.57 |
| Jun-01 | $3,200 | $3,300,000 | 10.7% | $24,444 | $35.79 |
| May-01 | $3,100 | $11,900,000 | 8.75% | $41,319 | $53.52 |
| Nov-01 | $3,200 | $3,500,000 | 9.8% | $31,818 | $35.18 |
| Dec-01 | $3,300 | $3,750,000 | 9.5% | $37,500 | $46.44 |
| | | | | | |
| Mar-01 | $3,200 | $5,700,000 | 12% | $36,538 | $36.90 |

# EXHIBIT "10"

Search

Clark County, Nevada

M.W. Schofield, Assessor

# Real Property Parcel Record

| *General Information* | | | |
|---|---|---|---|
| Parcel No. | Owner and Mailing Address | Location Address City/Township | Assessor Description |
| 140-19-202-001 | MOGHADAM ALI<br>1806 E DALEY CANYON RD<br>SAN BERNARDINO CA 92404-2112 | 2101 SANDY LN<br>SUNRISE MANOR | PT GOV LOT 2<br>PT SW4 NW4 SEC 19-20-62 |

| Recorded Document No. | Recorded Date | Vesting |
|---|---|---|
| 20020125:01817 | 01/25/2002 | NO STATUS |

Click here to view the Assessor Map for this parcel number.
**Click On Parcel For Ownership History Information:** 140-19-202-001

| *Assessment Information* | | | *Supplemental Value* | | |
|---|---|---|---|---|---|
| Tax District | Appraisal Year | | Fiscal Year | Supplemental Improvement Value | Supplemental Improvement Account Number |
| 340 | 2002 | | 02-03 | | |

| *Real Property Assessed Value* | | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year** | **Land** | **Improvements** | **Personal Property** | **Exempt** | **Gross Assessed** | **Taxable Value Land+Imp.** |
| 2001-02 | 210000 | 632620 | 4380 | 0 | 847000 | 2407490 |
| 2002-03 | 252000 | 1171890 | 2180 | 0 | 1426070 | 4068260 |

Click here for Treasurer Information regarding real property taxes.

| *Estimated Lot Size* | *Appraisal Information* | | | |
|---|---|---|---|---|
| **Estimated Size** | **Original Const.Yr.** | **Last Sale Price Month/Year** | **Land Use** | **Dwelling Units** |
| Square Feet | 1980 | 3600000 01/02 | RESIDENTIAL APARTMENTS | 120 |
| 8.01 Acres | | | | |

***** NO RESIDENTIAL APPRAISAL RECORD FOR THIS PARCEL *****

| *AssessorMap Viewing Guidelines* |
|---|
| **In order to view the Assessor map you must have Adobe Acrobat Reader installed on your computer system.**<br><br>**THE ADOBE ACROBAT READER IS FREE.**<br><br>**If you have the Reader installed, to view map click on the following numbers 140192**<br><br>**If you do not have the Reader it can be downloaded from the Adobe site by clicking the following button. Once you have downloaded and installed the Reader from the Adobe site, it is not necessary to perform the download a second time to access the maps.**<br><br>Get Acrobat Reader |

**NOTE: THIS RECORD IS FOR ASSESSMENT USE ONLY. NO LIABILITY IS ASSUMED AS TO THE ACCURACY OF THE DATA DELINEATED HEREON.**

# EXHIBIT "11"

Search

# Clark County, Nevada

## M.W. Schofield, Assessor

# Real Property Parcel Record

Assessor Map | Aerial View | Ownership History

***General Information***

| Parcel No. | Owner and Mailing Address | Location Address City/Township | Assessor Description |
|---|---|---|---|
| 140-19-202-001 | MOGHADAM ALI<br>1806 E DALEY CANYON RD<br>SAN BERNARDINO CA 92404-2112 | 2101 SANDY LN<br>SUNRISE MANOR | PT GOV LOT 2<br>PT SW4 NW4 SEC 19-20-62 |

| Recorded Document No. | Recorded Date | Vesting |
|---|---|---|
| * 20020125:01817 | 01/25/2002 | NO STATUS |

*Note: Only documents from September 15, 1999 through present are available for viewing.

| ***Assessment Information*** | | | ***Supplemental Value*** | | |
|---|---|---|---|---|---|
| Tax District | Appraisal Year | | Fiscal Year | Supplemental Improvement Value | Supplemental Improvement Account Number |
| 340 | 2002 | | 03-04 | | |

***Real Property Assessed Value***

| Fiscal Year | Land | Improvements | Personal Property | Exempt | Gross Assessed | Taxable Value Land+Imp. |
|---|---|---|---|---|---|---|
| 2002-03 | 252000 | 1171890 | 2180 | 0 | 1426070 | 4068260 |
| 2003-04 | 252000 | 1225326 | 1910 | 0 | 1479236 | 4220930 |

Click here for Treasurer Information regarding real property taxes.

| *Estimated Lot Size* | *Appraisal Information* | | | |
|---|---|---|---|---|
| Estimated Size | Original Const.Yr. | Last Sale Price Month/Year | Land Use | Dwelling Units |
| Square Feet | 1980 | 3600000 01/02 | RESIDENTIAL APARTMENTS | 120 |
| 8.01 Acres | | | | |

******* NO RESIDENTIAL APPRAISAL RECORD FOR THIS PARCEL *******

***AssessorMap Viewing Guidelines***

**In order to view the Assessor map you must have Adobe Acrobat Reader installed on your computer system.**

**THE ADOBE ACROBAT READER IS FREE.**

**If you have the Reader installed, to view map click on the following numbers 140192**

**If you do not have the Reader it can be downloaded from the Adobe site by clicking the following button. Once you have downloaded and installed the Reader from the Adobe site, it is not necessary to perform the download a second time to access the maps.**

Get Acrobat Reader

**NOTE: THIS RECORD IS FOR ASSESSMENT USE ONLY. NO LIABILITY IS ASSUMED AS TO THE ACCURACY OF THE DATA DELINEATED HEREON.**

Government Center, 500 South Grand Central Parkway, Las Vegas, Nevada 89155-1401

702-455-3882 (INFORMATION)

Return to Hom